FOR PUBLICATION

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 18-14671

————————————

JIMMY DAVIS, JR.,

*Petitioner-Appellant,*

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,

*Respondent-Appellee.*

————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:07-cv-00518-CLS

————————————

Before JORDAN, ROSENBAUM, JILL PRYOR, BRANCH, GRANT, LUCK,
LAGOA, ABUDU, and KIDD, Circuit Judges.*

————————————

* Chief Judge Pryor, Judge Newsom, and Judge Brasher recused themselves
and did not participate in the en banc poll.

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this appeal should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting rehearing en banc, IT IS ORDERED that this appeal will not be reheard en banc.  The Petition for Rehearing en banc filed by Jimmy Davis, Jr. (D.E. 97) is denied.

BRANCH, Circuit Judge, joined by GRANT, Circuit Judge, Concurring in the Denial of Rehearing En Banc:

In 1994, an Alabama jury convicted Jimmy Davis, Jr., of the capital offense of murder committed during a robbery in the first-degree. As we recounted in the majority opinion:

> The state's evidence showed that on March 17, 1993, Davis, Alphonso Phillips, and Terrance Phillips made plans to rob the Direct Oil Station, a gasoline service station in Anniston. According to the plan, Davis, who possessed a .25 caliber semiautomatic pistol, would point the pistol at the station operator, Alphonso would grab the money, and Terrance would act as a lookout. The state's evidence supported the conclusion that Davis was the principal actor in the conspiracy. He conceived the idea to rob the station and he recruited the others to help him. As the trio approached the station, Terrance changed his mind, abandoned the conspiracy, and walked away. Alphonso and Davis approached the station; Davis confronted the operator, Johnny Hazle, in the doorway of the station, pointed the pistol at him, and said, "Give it up, fuck-n*****." Davis almost immediately fired two shots from the pistol, which struck Hazle in the chest and abdomen. Terrance testified that he was about a block from the station, walking toward his home, when he heard two or three shots fired. After the shooting, Davis and Alphonso ran from the scene. Hazle died from these wounds shortly thereafter. Three empty .25 caliber shell casings were recovered at the scene, and two bullets of the same

caliber were recovered from Hazle's body.  The pistol was subsequently recovered.  The ballistics evidence showed that the two bullets recovered from Hazle's body and the three empty shell casings found at the scene had been fired from Davis's pistol.

Both Alphonso and Terrance pleaded guilty to conspiracy to commit robbery in the first-degree and testified against Davis.  Alphonso testified that, when they reached the door of the gas station, Davis "pointed the pistol at Hazle and said, 'Give it up, fuck-n*****'; that Hazle . . . smiled; and that Davis shot Hazle when he smiled."  Similarly, although Terrance was walking home when the robbery occurred, Terrance testified that Davis told him after the robbery that:

> he had told [Hazle], Give it up, fuck-n*****. And then he said the man had smiled or something at him, laughed or something.  And then he said he had shot and the man had kicked the door.  And then he shot again. . . .  And then he said they ran.

Other individuals similarly testified that Davis relayed similar information and told them that he had robbed the gas station and shot someone.

. . . .

The jury found Davis guilty of murder committed during a robbery in the first-degree as charged.

*Davis v. Comm'r, Ala. Dep't of Corr.*, 120 F.4th 768, 774–75 (2024) (alterations adopted) (quotations and citations omitted).  Following the penalty phase, at which Davis's mother and cousin testified, along with psychometrist Annie Storey, the jury returned an 11 to 1 advisory recommendation in favor of the death penalty.[1]  *Id.* at 776–79.  The trial court imposed the death penalty, and the Alabama Court of Criminal Appeals ("ACCA") affirmed.  *Davis v. State*, 718 So. 2d 1148 (Ala. Crim. App. 1995).

Thereafter, postconviction proceedings and appeals proceeded in the state court for over a decade, but Davis was unsuccessful.  Having exhausted his state avenues for relief, Davis filed a 28 U.S.C. § 2254 federal habeas petition in the federal district court.  Following the denial of his § 2254 petition, Davis obtained a certificate of appealability from this Court in which he argued that the ACCA unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in denying his claims that trial counsel rendered ineffective assistance in the penalty phase of his capital trial by (1) failing to investigate and present mitigating evidence of childhood abuse and (2) failing to investigate and present mitigating evidence of the

---

[1] Approximately 40 minutes into deliberations, the jury submitted a question to the court asking whether the court could "accept seven for death and five for life?"  The trial court explained that there had to be at least 10 votes for death or 7 for life and instructed the jury to keep deliberating.  *See* Ala. Code § 13A-5-46(f) (1993) (explaining that a recommendation of life required only a bare majority vote of the jurors, but a recommendation of death required the vote of at least 10 jurors).  Additionally, at the time of Davis's trial, the jury's recommendation was merely advisory.  The trial court had the ultimate sentencing authority.  *Id.* § 13A-5-47(a) (1993).

circumstances of his prior conviction for third-degree robbery. A divided panel of this Court affirmed, holding that the ACCA's conclusion that Davis was not prejudiced by his trial counsels' failure to present evidence of Davis's childhood abuse and the circumstances of his prior Alabama third-degree robbery conviction was not contrary to, or an unreasonable application of, clearly established federal law under 28 U.S.C. § 2254(d). *See Davis*, 120 F.4th at 789–99. I concur in the denial of rehearing en banc for the reasons set forth in the majority opinion. *See id.*

My dissenting colleague misreads our panel decision and incorrectly asserts that our treatment of the jury's initial hesitation in the context of our prejudice discussion "created a new limit on clearly established law." To be clear, our majority panel opinion did not dispute that juror hesitation could be an indicator of prejudice or that the state court could have considered this information as part of a prejudice analysis. *See id.* at 797–98. Such hesitation is a valid factor—one of many—that a court may consider in assessing prejudice. Our majority decision merely rejected the dissent's contention that the ACCA's prejudice decision was an *unreasonable application of federal law* because it failed to *expressly* consider the jury's initial hesitation in its prejudice analysis. *Id.* at 797. Our conclusion was a proper application of Supreme Court precedent and AEDPA. Not only did Davis never make an argument about the state court's failure to consider the initial juror hesitation as part of the prejudice analysis—it was instead raised for the first time in the dissenting opinion—but the Supreme Court has never held that a jury's hesitation in reaching a verdict is necessarily a

presumptive indicator of prejudice under *Strickland* or that such a factor must be considered or should weigh more heavily in the prejudice analysis. *Strickland* is a very general standard, and Judge Abudu's contention that the ACCA was *required* to consider the jury's initial hesitation because it falls within the ambit of *Strickland*'s general framework of considering what happened at the original trial is an improper attempt "to refine or sharpen a general principle" into a specific legal rule that the Supreme Court has not announced. *See Marshall v. Rodgers*, 569 U.S. 58, 64 (2013). While *Strickland* requires "a court hearing an ineffectiveness claim [to] consider the totality of the evidence before the judge or jury," 466 U.S. at 695, that imperative "is a far cry from a federal court requiring that a state court prove to a federal court that it did so by setting out every relevant fact or argument in its written opinion," *see Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1212 (11th Cir. 2013). Yet, that heightened standard is essentially the standard Judge Abudu's dissent calls for state courts to employ in order for state court decisions to be deemed reasonable under AEDPA. Her standard turns AEDPA and its highly deferential framework on its head.

In sum, as explained in the majority opinion, Davis failed to show that the ACCA's determination that he did not suffer prejudice was "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). And that question is the only one we were tasked with answering under AEDPA. *See Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1041–42 (11th Cir. 2022) (*en banc*) ("Applying AEDPA to *Strickland*'s prejudice standard, we

must decide whether the state court's conclusion that [counsel's] performance at the sentencing phase . . . didn't prejudice [petitioner]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." (quotations omitted)).  Because fairminded jurists could disagree regarding the correctness of the ACCA's application of *Strickland* to Davis's penalty phase ineffective-assistance claims, we were bound by AEDPA and Supreme Court precedent to conclude that he was not entitled to habeas relief.  As a result, the Court properly denied *en banc* review.

18-14671                    ROSENBAUM, J., Dissenting                    1

ROSENBAUM, Circuit Judge, Dissenting from the Denial of Rehearing En Banc:

For the reasons I gave in my dissenting opinion, *Davis v. Comm'r, Ala. Dep't of Corr.*, 120 F.4th 768, 818–45 (11th Cir. 2024) (Rosenbaum, J., dissenting), I continue to think that we wrongly decided *Davis*. Judge Abudu also makes some excellent points highlighting the problems with the panel opinion.

If the panel opinion is wrong, Davis perhaps should not be executed. So this case seems to me to involve "a question of exceptional importance." I therefore respectfully dissent from the denial of rehearing en banc.

Abudu, Circuit Judge, Dissenting from the Denial of Rehearing En Banc:

Jimmy Davis, Jr., an Alabama prisoner, seeks habeas corpus relief from his death sentence based on his attorney's errors at trial that made his sentencing fundamentally and constitutionally unfair.[1] Without deciding whether his attorney's performance was so poor as to be constitutionally deficient, a split panel of this Court denied relief, concluding the state court reasonably found Davis did not suffer any prejudice from his attorney's failures. *Davis v. Comm'r, Ala. Dep't of Corr.*, 120 F.4th 768, 799 (11th Cir. 2024). For the reasons Judge Rosenbaum articulated in her dissent from the panel majority opinion, the district court should have granted Davis habeas relief. *Id.* at 818–51 (Rosenbaum, J., dissenting). As she thoroughly explained, the panel majority: (1) misapplied the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and on-point Supreme Court caselaw, *e.g.*, *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Porter v. McCollum*, 558 U.S. 30 (2009), to deny relief; (2) unreasonably minimized the mitigation value of the evidence Davis's attorney failed to present at trial, which showed that Davis suffered horrific childhood trauma and had no serious history of violence; and (3) gave no weight to the fact the jury—despite

---

[1] The Supreme Court established the test for ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on such a claim, a petitioner must show: (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. *Id.* at 687.

counsel's severe failures—was split, hesitant, and ultimately not unanimous in its recommendation to impose the death penalty.

All three of these errors, separately and combined, are sufficient to vacate the district court's ruling. However, the panel majority's dismissive treatment of the jury's hesitation warrants special attention. Davis was prejudiced by his attorney's failure to present weighty mitigation evidence at trial, and the jury's initial split—where nearly half of the jury was in favor of a life sentence—and the fact that the jury never reached a unanimous sentencing recommendation, show a reasonable probability that the missing pieces of mitigation evidence would have altered the outcome.

The panel majority's treatment of the jury's hesitation to impose the death penalty and its ultimate non-unanimous vote improperly suggests the jury's role is far less important than history and precedent demonstrate. The Supreme Court has repeatedly ruled that juries must be given the authority to determine the facts necessary for sentencing and must reach their conclusions unanimously. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Hurst v. Florida*, 577 U.S. 92, 94 (2016); *Ramos v. Louisiana*, 590 U.S. 83, 90 (2020). In *Strickland* itself, the Supreme Court established a test for ineffective assistance claims that requires courts to look at the relevant decisionmaker's on-the-record conduct at trial. *See* 466 U.S. at 695. Here, that means the jury's conduct as the decisionmaker is of critical importance and should not be cast aside in a prejudice analysis. In a death penalty scheme like Alabama's, where the question of life and death is submitted to a jury, these principles compel

a conclusion that juries must unanimously agree to impose the death penalty for a death penalty sentence to be imposed. *Cf. Hurst*, 577 U.S. at 102–03; *Spaziano v. Florida*, 468 U.S. 447, 469–70 (1984) (Stevens, J., concurring and dissenting) (arguing that this protection is guaranteed under the Eighth Amendment); *Ring v. Arizona*, 536 U.S. 584, 614 (2002) (Breyer, J., concurring) (same). Any reasonable application of *Strickland* to a non-unanimous and conflicted jury must be informed by the Constitution's focus on the jury trial right and a proper appreciation of the jury's role in our legal system. Such a historically informed view of the Sixth Amendment shows that courts must weigh jury hesitation when assessing prejudice.

Given the jury's role in death penalty sentencing, moreover, effective assistance in the death penalty context requires adequate investigation and presentation of mitigating evidence to aid a jury in fairly determining whether to impose a death sentence. *See, e.g.*, *Rompilla*, 545 U.S. at 387–90; *Wiggins v. Smith*, 539 U.S. 510, 520–29 (2003). "Although a sentencing authority may decide that a sanction less than death is not appropriate in a particular case, the fundamental respect for humanity underlying the Eighth Amendment requires that the defendant be able to present any relevant mitigating evidence that could justify a lesser sentence." *Sumner v. Shuman*, 483 U.S. 66, 85 (1987); *see also Boyde v. California*, 494 U.S. 370, 387 (1990) (Marshall, J., dissenting) ("The insistence in our law that the sentencer know and consider the defendant as a human being before deciding whether to impose the ultimate sanction operates as a shield against arbitrary execution and enforces our abiding

4                    Abudu, J. Dissenting                    18-14671

judgment that an offender's circumstances, apart from his crime, are relevant to his appropriate punishment."). When Davis's counsel's performance and the jury's hesitation and non-unanimity are reviewed with this historical and doctrinal backdrop, the state court's conclusion that Davis suffered no prejudice is untenable. The panel majority was wrong to diminish the jury's lack of consensus to impose the death penalty and to minimize Davis's mitigating evidence, and its reasoning erodes the Sixth Amendment's rights to effective assistance of counsel and a fair jury trial.

The full facts of the case are not recounted here. *See Davis*, 120 F.4th at 818–51 (Rosenbaum, J., dissenting). The key point is that Davis's counsel presented a woefully inadequate mitigation case during the penalty phase of trial. *Id.* at 818. After 40 minutes of deliberation, the jury submitted a question to the trial court: "Can you accept seven [jurors voting] for death and five for life? If not, what procedure should we go by?" *Id.* at 779 n.6 (majority opinion). After the trial judge said that the jury could not be split this way, the jury deliberated further and returned a non-unanimous verdict: 11 to 1 for the death penalty. *Id.* at 779 & n.6. Then, despite the jury's non-unanimous recommendation, the trial judge "found that two statutory aggravating circumstances existed" and imposed the death penalty. *Id.* at 779.

In rejecting Davis's appeal, the panel majority broke new ground and rejected the jury's behavior as irrelevant. First, it stated that the Supreme Court has "never held that a jury's hesitation . . . is necessarily an indicator of prejudice . . . ." *Id.* at 798.

Second, it concluded that the Supreme Court has never held that jury hesitation "must be considered" by a court assessing prejudice. *Id.*

To be clear, the panel majority only reached these holdings because they were necessary to answer the question Davis raised in his habeas petition, on which this Court granted him a certificate of appealability. *See Freeman v. Comm'r, Ala. Dep't of Corr.*, 46 F.4th 1193, 1215 (11th Cir. 2022) (explaining that certificates of appealability "encompass any issue that 'must be resolved before reaching the merits' of a claim identified in" that certificate of appealability). This highly important legal issue is squarely before us and the answer to the issue could determine whether Davis will be executed.[2]

Because the Supreme Court has instructed courts to consider jury hesitation when determining whether deficient performance prejudices the outcome, and because the historical scope of the right to a jury counsels against the panel majority's holdings, we should have reheard this case *en banc* to correct the panel majority's errors.

---

[2] There was no requirement, nor would there have been any grounds, for Davis to raise a standalone claim based on the jury's hesitation: his claim throughout has been that his attorney was deficient and he was prejudiced by that deficiency. *See Davis*, 120 F.4th at 773 ("Before us are Davis's arguments that the state court unreasonably applied *Strickland* . . . in denying his claim that trial counsel rendered ineffective assistance in the penalty phase of his capital trial . . . ."). Thus, Judge Rosenbaum's panel dissent and this opinion address an issue of exceptional importance.

## I.    AEDPA, *STRICKLAND*, & JUROR HESITATION

When AEDPA applies, a federal court may grant habeas relief only if the decision of the state court: (1) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) was based on an unreasonable determination of the facts considering the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(1), (2).  If AEDPA deference does not apply, a federal court applies *de novo* review to a petitioner's claim.  *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1346 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 443 (2024) (mem.); *Adkins v. Warden*, 710 F.3d 1241, 1250 (11th Cir. 2013).

"'[C]learly established federal law' for purposes of" AEDPA "includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)).  When the Supreme Court "relies on a legal rule or principle," even a seemingly broad rule or principle, "to decide a case, that principle is a 'holding'" for purposes of AEDPA.  *Andrew v. White*, 604 U.S. 86, 92 (2025); *id.* at 94 ("General legal principles can constitute clearly established law for purposes of AEDPA . . . .").  While AEDPA precludes federal habeas relief in situations where relief requires the extension of federal law, *Woodall*, 572 U.S. at 424–26, this does not mean "that § 2254(d)(1) requires an 'identical factual pattern before a legal rule must be applied,'" *id.* at 427 (quoting *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)).  "[C]ertain principles [can be] fundamental enough that when new factual permutations arise,

the necessity to apply the earlier rule will be beyond doubt." *An-drew*, 604 U.S. at 95 (quoting *Woodall*, 572 U.S. at 427).

Importantly, there is a difference between deference to a state court's *application* of precedent and a federal court's "independent obligation" to determine what the law is. *Id.* The questions regarding what constitutes "clearly established law," and when that law applies in a given case are "threshold," and our review is "*de novo*," without deference to state courts. *Id.*; *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Walker v. Cromwell*, 140 F.4th 878, 890 n.3 (7th Cir. 2025). AEDPA's deferential standard does not in any way eliminate an Article III court's obligation to determine anew what law applies to a given case and, as applies here, what the Sixth Amendment requires.[3]

With the significance of juror hesitation at issue, the panel majority should have answered, *de novo*, the question of what federal law requires. *Strickland* answers both: (1) how much harm a petitioner like Davis must suffer from counsel's performance to

---

[3] *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) ("It is emphatically the province and duty of the judicial department to say what the law is." (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803))); *id.* at 430 (Gorsuch, J., concurring); Anthony G. Amsterdam & James S. Liebman, Loper Bright *and the Great Writ*, 56 COLUM. HUM. RTS. L. REV. 54, 153–57 (2025) (exploring tension between AEDPA and the Supreme Court's precedent in other contexts); *see also Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., concurring) ("We have always held that federal courts, even on habeas, have an independent obligation to say what the law is." (citation omitted)).

show prejudice; and (2) what courts must consider in assessing whether a petitioner has suffered prejudice.

As to how much harm, *Strickland* says a petitioner needs to show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S at 694. "This standard" is not so stringent as to require "a defendant to show that it is more likely than not that adequate representation would have led to a better result . . . ." *Thornell v. Jones*, 602 U.S. 154, 163–64 (2024). Instead, a court must ask whether counsel's poor performance simply has created a "reasonable probability" of a different result that is "sufficient to undermine confidence in the outcome." *Id*. at 164 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)). Yet, assessing prejudice in every ineffectiveness case does not require hard and fast rules; it is a practical inquiry. *See Strickland*, 466 U.S. at 696. Courts must "be concerned with whether . . . the result of a particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id*.

As to how to assess harm, "a court must 'consider the *totality of the evidence* before the judge or jury'—both mitigating and aggravating" and the underlying proceedings. *Thornell*, 602 U.S. at 164 (emphasis added) (quoting *Strickland*, 466 U.S. at 695). This rule is straightforward: to assess whether counsel's errors affected the proceeding, a court must review what happened and compare it to what hypothetically would have happened if counsel had not been

deficient.[4]  In Davis's case, this means the state court should have compared the conduct of Davis's attorney to that of a reasonable attorney to determine whether Davis suffered prejudice from his attorney's failures.  For Davis to prevail on prejudice, he had to show only a reasonable probability that the jury would have reached a different result.  *Strickland*, 466 U.S. at 695.  The fact that the jury already was conflicted is of paramount importance in undertaking this analysis.

This especially is clear because the Supreme Court discussed essentially this issue in *Strickland*.  *Id*.  The Supreme Court explained that a court assessing prejudice must focus on what actually happened on the record at trial.  *Cf. id*. ("[E]vidence about the actual process of decision, *if not part of the record* of the proceeding under review . . . should not be considered." (emphasis added)).  It contrasted this proper on-the-record focus with what a court "should not" do, which would be to consider outside sources that might shed light on "the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency," because those facts are irrelevant.  *Id*.  The jury here expressed its hesitation and its split on the record at trial, *id*., so the hesitation must be considered under the Supreme Court's test in *Strickland*.

---

[4] As my colleague has put it, *Strickland* requires "a predictive human endeavor based on a hypothetical construct."  *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1058 (11th Cir. 2022) (*en banc*) (Jordan, J., concurring).

The state court in Davis's case failed to discuss or consider the fact that five jurors were predisposed to a life sentence even though Davis's counsel failed to present *any substantive mitigation evidence*. Moreover, the mitigation evidence counsel should have uncovered, if an adequate investigation had been performed, painted a very different story than that told at trial.

At trial, the State presented evidence of two statutory aggravating circumstances in support of its position that the jury should sentence Davis to death: (1) the murder Davis committed occurred during a robbery; and (2) Davis had a prior 1992 conviction for third-degree robbery. *Davis*, 120 F.4th at 839 (Rosenbaum, J., dissenting); *see also* Ala. Code. § 13A-5-51 (1994) (statutory aggravators). The State argued the prior robbery was "dangerous to human life" and a "very, very aggravating circumstance." *Davis*, 120 F.4th at 827 n.11 (Rosenbaum, J., dissenting). The State introduced a record of Davis's conviction for the 1992 robbery, which Davis's attorney stipulated was accurate. *Id.* at 775 (majority opinion). In mitigation, Davis's counsel suggested Davis's mother "raised him the best she could without a father," and that Davis did not have "somebody in the home that . . . could really discipline him." *Id.* at 819 (Rosenbaum, J., dissenting). Davis's attorney had Davis's mother testify, where she stated she "had problems with [Davis]" since he was nine years old. *Id.*

The facts presented in Davis's ineffectiveness claim paint a very different picture than the facts the jury considered. Davis was 22 at the time of the prior robbery. *Id.* at 818. The crime began

when Davis and three of his friends ordered a pizza. *Id.* Once the pizza deliveryman arrived, one of the men made a finger gesture in his pocket as if he had a gun, and then the group took the pizzas and $50 from the deliveryman and ran off. *Id.* The police quickly caught them and found Davis carrying a pizza. *Id.* No evidence suggested that Davis was the ringleader, and neither weapons nor violence were involved. *Id.* In fact, the deliveryman later said that "there really was never a threat made to him." *Id.* Davis's counsel never investigated these facts, and thus never argued (or presented available evidence) that this prior conviction—Davis's only prior conviction underlying the aggravating factor—did not involve violence or weapons and was not, as the State put it at trial, "dangerous to human life" and a "very, very aggravating circumstance." *Id.* at 827 n.11.

Davis's counsel also failed to investigate and present evidence of the extreme abuse Davis suffered throughout his childhood at the hands of his own mother, resulting in serious physical and psychological injuries. *Id.* at 819. Once, when Davis was in the second grade, she beat him until his head was "dented," "warped," and "swollen," and "his ear was partially severed." *Id.* Several times, after vicious beatings, Davis went "into spasm[s]" and shook for days. *Id.* Davis's file with the Alabama Department of Human Resources included photographs of his injuries and, after examining him, a local social worker stated that she had "never seen a back that looked worse than Jimmy's." *Id.* This abuse lasted at least until Davis was 14 or 15 years old. *Id.* Even so, Davis's counsel only cursorily interviewed Davis and his mother (his

abuser) and never investigated this horrific history of abuse.  *Id.*
Davis's attorney then called Davis's mother as a mitigation witness
and, unsurprisingly, she provided testimony that hurt Davis's case.
*Id.*

The Alabama Court of Criminal Appeals rejected Davis's in-
effective assistance claim on procedural grounds but noted the
weight of this evidence and the jury's hesitation, stating that "[c]er-
tainly, it is reasonable to conclude that the evidence of Davis's child
abuse could very well have tipped the scales in the other direction."
*Davis v. State*, 9 So. 3d 514, 524 (Ala. Crim. App. 2006) ("*Davis I*"),
*overruled*, 9 So. 3d 537 (Ala. 2007).  Two years later, however, ruling
on the merits, the same court reasoned that none of this evidence
would have changed the outcome of trial.  *Davis v. State*, 9 So. 3d
539, 553 (Ala. Crim. App. 2008) ("*Davis II*").[5]  In that opinion, the
relevant decision for AEDPA's purposes, the state court did not
consider the jury's hesitation in its analysis of whether there was a
reasonable probability the outcome would have been different had
Davis's counsel presented this mitigation evidence.  *See id.*

To sidestep the obvious import of the jury's initial unwill-
ingness to impose the death penalty without knowledge of any of
the highly mitigating facts summarized above—and the state
court's obvious error in failing to consider that hesitation and non-

---

[5] After being reversed by the Alabama Supreme Court, the state court changed
course and called its rulings—*e.g.,* that Davis's mitigation evidence was "pow-
erful" and that it "would be compelled to grant relief and order a new sentenc-
ing hearing," *Davis I*, 9 So. 3d at 522—"dicta," *Davis II*, 9 So. 3d at 553.

unanimity—the panel majority created a new limit on clearly established law.  It held that juror hesitation is not "necessarily an indicator of prejudice" or a fact that "must be considered" or given weight, because the Supreme Court has never so held.  *Davis*, 120 F.4th at 798 (majority opinion).   These conclusions violate *Strickland* and *Andrew* and confuse the inquiry.  Federal law, which we determine *de novo*, provides the rule: a court must undertake a holistic review of the omitted evidence and the record of the proceedings.  *Strickland*, 466 U.S. at 694–96.  No court applying *Strickland* can ignore what happened at trial when assessing prejudice.  *Id.*  The state court's failure to apply this blackletter law—*i.e.*, to consider the totality of circumstances, including the jury's hesitation, in assessing prejudice—should have triggered *de novo* review.  *Calhoun*, 92 F.4th at 1346; *Adkins*, 710 F.3d at 1250.

AEDPA does not require the Supreme Court to have decided a case with identical facts as Davis's for us to say the Alabama courts unreasonably applied *Strickland* by not considering this highly relevant circumstance.  *Andrew*, 604 U.S. at 95; *Woodall*, 572 U.S. at 427.  Indeed, the panel majority cites no cases where juror hesitation has *not* been considered by a court assessing prejudice; our cases, and the cases from our sister circuits, uniformly go in the other direction.[6]  Alabama courts themselves have considered juror

---

[6] *See, e.g.*, *Blanco v. Singletary*, 943 F.2d 1477, 1505 (11th Cir. 1991); *Cave v. Singletary*, 971 F.2d 1513, 1519 (11th Cir. 1992); *Lawhorn v. Allen*, 519 F.3d 1272, 1297–98 (11th Cir. 2008); *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1276 (11th Cir. 2016); *Sears v. Warden GDCP*, 73 F.4th 1269, 1298 (11th Cir. 2023); *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 564 (11th Cir. 2015);

hesitation in this context when it has been presented—except, it seems, in the second decision in Davis's case. *E.g.*, *Reeves v. State*, 974 So. 2d 314, 325 (Ala. Crim. App. 2007); *Ex parte Carroll*, 852 So. 2d 833, 836 (Ala. 2002). In this way, the panel majority opinion is an extreme outlier; making us the first state or federal court to suggest—in the 40 years since *Strickland*—that a court may ignore the jury's behavior in assessing prejudice.

This uniform caselaw and practice only further demonstrates that the Supreme Court in *Strickland* already has determined that jury hesitation is relevant. The panel majority was thus also wrong to limit *Strickland* in a way the Supreme Court never has. *Cf. Motorcity Ltd. ex rel. Motorcity, Inc. v. Se. Bank N.A.*, 120 F.3d 1140, 1143 (11th Cir. 1997) (*en banc*) ("[We] must follow Supreme Court precedent that has 'direct application' in a case, even if it appears that the reasoning of the Supreme Court precedent has been rejected in other cases. Only the Supreme Court has 'the prerogative of overruling its own decisions.'" (citation omitted) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989))); *United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (*en banc*) ("[W]e must apply Supreme Court precedent neither narrowly nor liberally—only faithfully.").

---

*Jordan v. Hargett*, 34 F.3d 310, 316 (5th Cir. 1994); *Mason v. Mitchell,* 543 F.3d 766, 780 (6th Cir. 2008); *Stankewitz v. Wong*, 698 F.3d 1163, 1175 (9th Cir. 2012); *Vega v. Ryan*, 757 F.3d 960, 974 (9th Cir. 2014); *Williams v. Stirling*, 914 F.3d 302, 318 (4th Cir. 2019); *Sanders v. Davis*, 23 F.4th 966, 994–95 (9th Cir. 2022).

Prejudice is assessed by considering "the totality of the new mitigating evidence," and "juxtapos[ing]" it with the evidence presented in that original trial, in light of what happened at the original trial. *Pye*, 50 F.4th at 1058 (Jordan, J., concurring). The jury was an integral and constitutionally required part of the original trial, so the only reasonable application of *Strickland*'s test is (1) to consider that the jury was hesitant to impose the death penalty and (2) to conclude that Davis's strong mitigating evidence is clearly "sufficient to undermine confidence in the outcome" of the trial. *Thornell*, 602 U.S. at 163–64. For these reasons, a rule that minimizes the jury's role in assessing prejudice departs from the clear federal law the Supreme Court established in *Strickland*.[7]

## II.    THE JURY'S ROLE & THE CONSTITUTION

Even though the panel majority's errors under AEDPA justified *en banc* review, the panel majority's treatment of jury hesitation suffers from a broader problem: it minimizes the importance of the jury in our legal system. The Constitution requires that we take juries seriously. In Davis's case, even with counsel's failures, the State never obtained a unanimous jury recommendation for the death penalty. In fact, notwithstanding the jury's non-unanimous verdict, the state court made findings that statutory aggravating circumstances were present. In this context, Davis's non-unanimous sentencing verdict not only clearly shows *Strickland*

---

[7] In fact, the Supreme Court has expressly rejected the adoption of "strict rules" in applying *Strickland*, such as the no-consideration of juror hesitation rule the panel majority approved here. *Cullen*, 563 U.S. at 196.

prejudice, it should foreclose his death sentence altogether.  While our rulings in the habeas context might not fix unconstitutional death penalty schemes, we should view Davis's *Strickland* claim of prejudice through the context and historical tradition of valuing and prioritizing the jury's perspective.  Applying this historical tradition and precedent shows that the jury's non-unanimity and hesitation is one of the best, if not the best, indication of prejudice.

The Sixth Amendment guarantees that defendants like Davis receive effective assistance of counsel and that "[i]n all criminal prosecutions" they "enjoy the right to a speedy and public trial, by an impartial jury . . . ."  U.S. CONST. amend. VI.  As the Supreme Court has explained, juries "protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority." *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968).  This "[p]rovid[es] . . . an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Id.* (holding that this protection applies to state prosecutions because "[t]he deep commitment of the Nation to the right of jury trial in serious criminal cases" serves "as a defense against arbitrary law enforcement"). [8]

As the Supreme Court recently explained in *Ramos*, the right to a jury trial is substantive; it means "*something.*"  590 U.S. at 89

---

[8] "Beyond this, the [rights to a jury trial] in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." *Duncan*, 391 U.S. at 156.

18-14671                ABUDU, J., Dissenting                    17

(emphasis in original).  Historically, one of the core and "unmistak-able" features of the right is "unanimity."  *Id.* at 90.[9]  The jury's role in sentencing, also with its required unanimity, also is protected by the Constitution and proven through historical practice.  Histori-cally, juries in England could, and did, refuse to convict on capital charges when they believed the crimes did not warrant execution. *See Jones v. United States*, 526 U.S. 227, 245–46 (1999); Thomas A. Green, VERDICT ACCORDING TO CONSCIENCE: PERSPECTIVES ON THE ENGLISH CRIMINAL TRIAL JURY 1200-1800, 18–20 (1985) ("The power of the jury may have reflected more than its institutional setting and role:  it may have reflected a social understanding about the appropriate circumstances under which a person's life might be surrendered to the Crown.").  After the founding, juries' refusals to return verdicts of guilty to avoid subjecting a defendant to execu-tion led to criminal reforms that cut down on "the number of cap-ital offenses" and "separate[d] murder into degrees."  *Woodson v. North Carolina*, 428 U.S. 280, 290–93 (1976); *see also Winston v. United States*, 172 U.S. 303 (1899) (reversing murder conviction where

---

[9] Indeed, the "origins" of nonunanimous convictions in state courts "are clear," and intentionally aimed to thwart the Sixth Amendment's protections. *Ramos*, 590 U.S. at 88.  States adopted provisions allowing for nonunanimous juries during the Jim Crow era to nullify the votes of Black citizens participat-ing in juries for the first time.  *Id.; see also id.* at 88 n.4 (citing, among others, Thomas Ward Frampton, *The Jim Crow Jury*, 71 VAND. L. REV. 1593 (2018)); Frampton, 71 VAND. L. REV. at 1613 (explaining that some sources "endorsed the adoption of nonunanimous verdicts as a way of placating those intent on committing extralegal forms of racial violence").

district court had improperly limited the jury's discretion to impose a life sentence).

Given the role of juries in the development of our criminal legal system and the structural protections afforded by having a trial by jury—and, again, because it had served as a valuable tool for resistance against colonial England—it is natural that the jury trial right was of utmost importance to the founders. *See* Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. CHI. L. REV. 867, 869–75 (1994) (detailing the history that led to the Sixth Amendment); *cf. SEC v. Jarkesy*, 603 U.S. 109, 121 (2024) (civil context) ("The right to trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care.'" (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935))). To protect this right, James Madison drafted the Bill of Rights to include criminal and civil "protections for the jury trial right." *Erlinger v. United States*, 602 U.S. 821, 830 (2024). The Sixth Amendment, the Supreme Court has explained, was designed to alleviate "fear[]" that the "government might fall prey to the kinds of temptations that led the British to restrict the jury trial right in the colonies." *Id.* Given that history, it is logical that the Supreme Court repeatedly has stepped in to protect the right to a jury trial and to preserve juries' role. The Court has done so in numerous ways.

For instance, both the Supreme Court and this Court have recognized many times that the Constitution requires juries to be

representative of the community and selected in a non-discriminatory manner. *See, e.g.*, *Strauder v. West Virginia*, 100 U.S. 303 (1880); *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Taylor v. Louisiana*, 419 U.S. 522 (1975); *Duren v. Missouri*, 439 U.S. 357 (1979); *Batson v. Kentucky*, 476 U.S. 79 (1986); *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127 (1994); *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017); *Flowers v. Mississippi*, 588 U.S. 284 (2019); *United States v. Brown*, 996 F.3d 1171 (11th Cir. 2021) (*en banc*); *Sockwell v. Comm'r, Ala. Dep't of Corr.*, 141 F.4th 1231 (11th Cir. 2025). Then, once a jury is constitutionally selected, and a criminal case proceeds to a trial, juries are given significant deference in finding facts and are presumed to follow the court's instructions.[10] *See, e.g.*, *United States v. Pulido*, 133 F.4th 1256, 1276 n.17 (11th Cir. 2025); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005) ("A jury is presumed to follow the instructions given to it by the district judge."). We affirm convictions if any rational jury could possibly have reached the result the jury did in a given case.

---

[10] Indeed, if a jury's factual findings lead to an acquittal, as the Supreme Court has explained, that "jury's verdict of acquittal is inviolate." *McElrath v. Georgia*, 601 U.S. 87, 94 (2024). Thus, while judges can step in to acquit a defendant after a jury convicts to avoid manifest injustice, *e.g.*, *United States v. Tapia*, 761 F.2d 1488, 1492 (11th Cir. 1985), juries "hold[] an 'unreviewable power . . . to return a verdict of not guilty' even 'for impermissible reasons,'" *Smith v. United States*, 599 U.S. 236, 253 (2023) (quoting *United States v. Powell*, 469 U.S. 57, 63 (1984)). In light of this constitutionally protected asymmetry between judges and juries, Alabama's death penalty scheme, which puts judges as the driver of the death penalty sentencing proceedings notwithstanding the jury's view, is ahistorical and unconstitutional, as explained above.

*See id.*; *United States v. Burnette*, 65 F.4th 591, 604 (11th Cir. 2023) ("[A] guilty verdict need only 'be reasonable, not inevitable, based on the evidence presented at trial.'" (quoting *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007))).  We often explain that it is a jury's role—not a court's—"to weigh the evidence, make credibility determinations, and [to] draw any legitimate inferences from the facts."  *Hicks v. Middleton*, 141 F.4th 1174, 1180 (11th Cir. 2025) (civil context); *see also United States v. Brown*, 53 F.3d 312, 316 (11th Cir. 1995) ("All questions of credibility are for the jury").  So great is our deference to the jury that we repeatedly have held that if a jury disbelieves a defendant's testimony, the jury may consider that disbelief as *"substantive evidence* of the defendant's guilt." *Brown*, 53 F.3d at 314 (emphasis in original) (collecting cases); *United States v. Beaufils*, 160 F.4th 1147, 1164 (11th Cir. 2025) (same).[11]

---

[11] In some respects, the law calls on us to afford juries greater deference even than we give to experienced judges.  *See, e.g.*, Joseph Blocher & Brandon L. Garrett, *Fact Stripping*, 73 DUKE L.J. 1, 21–22 (2023) (describing the "typical rule[]" that deference to a jury's finding of facts is more deferential than clear error review, which applies to judge-found facts, but arguing that recent practice has undermined this rule).  So, while this Court has "habit[ually]" failed to give appropriate deference to our district court colleagues, *Otto v. City of Boca Raton*, 41 F.4th 1271, 1285 (11th Cir. 2022) (Jordan, J., dissenting from the denial of reh'g); *see also Fla. Decides Healthcare, Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, at *9 (11th Cir. Sept. 9, 2025) (Abudu, J., dissenting) (same), we traditionally have been consistent about giving deference to juries, *see Brown*, 996 F.3d at 1183 ("Jurors *are* ordinary people.  They are expected to speak, debate, argue, and make decisions the way ordinary people do in their daily lives.  Our Constitution places great value on this way of thinking,

18-14671    Abudu, J., Dissenting    21

The jury's role at sentencing also is constitutionally protected and rooted in history.[12]  As the Supreme Court has held, the Constitution provides a "time-honored guarantee that a unanimous jury ordinarily must find beyond a reasonable doubt any fact that increases a defendant's exposure to punishment." *Erlinger*, 602 U.S. at 836; *see also, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004); *Alleyne v. United States*, 570 U.S. 99 (2013); *Hurst*, 577 U.S. at 94.  Accordingly, in a situation like Davis's, where state law creates statutory aggravating circumstances that affect whether the death penalty should be imposed, *see* Ala. Code. § 13A-5-51 (1994); *Davis*, 120 F.4th at 775 n.4 (majority opinion), the Constitution establishes that those factors must be tried to a jury and the jury, not a judge, must unanimously conclude that the government established the existence of those aggravating circumstances, *see Ring*, 536 U.S. at 609 (majority opinion) ("Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' *Apprendi*, 530 U.S. at 494 n.19, the Sixth Amendment requires that they be found by a jury."); *see also id.* at

---

speaking, and deciding." (emphasis supplied) (quoting *Pena-Rodriguez*, 580 U.S. at 236 (Alito, J., dissenting))).

[12] *See* Nancy J. King, *The Origins of Felony Jury Sentencing in the United States*, 78 Chi.-Kent. L. Rev. 937, 937–38 (2003) (describing the history, beginning in the 1790s, of juries determining the appropriate sentence in state courts); Nancy J. King, *The American Criminal Jury*, 62 L. & Contemp. Probs. 41, 64 (Spr. 1999) ("One of the most unique tasks of the criminal jury in the United States is deciding whether a convicted criminal will be put to death for his [or her] crime.").

612 (Scalia, J., concurring) ("Accordingly, . . . wherever [aggravating] factors exist they must be subject to the usual requirements of the common law, and to the requirement enshrined in our Constitution, in criminal cases: they must be found by the jury beyond a reasonable doubt."); *Hurst*, 577 U.S. at 102 (holding the Sixth Amendment "right require[s] Florida to base . . . death sentence[s] on a jury's verdict, not a judge's factfinding").[13]

As noted, *Strickland* already says that a jury's hesitation should be considered in the totality of circumstances analysis applicable to assessing prejudice in a case like this. *Supra*, Section I. Given the history of juries and the reaffirmation of the paramount protection of the jury trial right in Supreme Court caselaw, it is not plausible that *Strickland* instructs courts to do something different than they do in every other jury trial context and disregard the jury. Therefore, the panel majority's reading of *Strickland* and application of AEDPA on the issue of juror hesitation flies in the face of this great body of caselaw and historical practice cementing the importance of juries and giving shape to the right to a fair jury trial.[14]

_____

[13] *Hurst*, *Ramos*, and *Ring* show that aggravating circumstances themselves must be tried to a jury and the jury must reach a conclusion on those circumstances unanimously. There is no question that Alabama's death penalty sentencing scheme provided various aggravating circumstances in 1994, Ala. Code. § 13A-5-51 (1994), *Davis*, 120 F.4th at 779 (majority opinion), so the Sixth Amendment (and precedent) establishes that a unanimous jury verdict should have been required on those issues.

[14] As noted previously, a court applying *Strickland* must "be concerned with whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce

*See United States v. Rahimi*, 602 U.S. 680, 738 (2024) (Barrett, J., concurring) (explaining that history "can reinforce our understanding of the Constitution's original meaning; liquidate ambiguous constitutional provisions; [and] provide persuasive evidence of the original meaning" (citations and quotations omitted)); *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491 (1931) ("Acts of Congress are to be construed and applied in harmony with and not to thwart the purpose of the Constitution." (quoting *Phelps v. United States*, 274 U.S. 341, 344 (1927))).  The Sixth Amendment has always instructed courts to respect and consider the perspectives of the community members our system entrusts with determining guilt and punishment, so our interpretation of AEDPA and *Strickland* should reflect that same structural concern and reverence.

### III.    JURIES AND THE DEATH PENALTY

In 1972, the Supreme Court held that the imposition of the death penalty in the cases before it violated the Constitution.  *Furman v. Georgia*, 408 U.S. 238, 239–40 (1972).[15]  In the years that

---

just results." *Strickland*, 466 U.S. at 696.  Just results, in this context, necessarily means that the proceeding be consistent with traditional understandings of fairness.  *Ramos*, 590 U.S. at 89 ("Imagine a constitution that allowed a 'jury trial' to mean nothing but a single person rubberstamping convictions without hearing any evidence . . . .").  For the same reason, we must ask, at the prejudice stage, what a fair trial, with constitutional representation and a unanimous jury, would have looked like.  *See Pye*, 50 F.4th at 1058 (Jordan, J., concurring).

[15] Rachel E. Barkow, *The Court of Life and Death: The Two Tracks of Constitutional Sentencing Law and the Case for Uniformity*, 107 MICH. L. REV. 1145, 1151–52 (2009) ("[The *Furman* Court's] central concern was avoiding arbitrary and

followed, the Supreme Court retreated from *Furman*, laying out the framework for the resumption of executions and death penalty trials—like Davis's in Alabama—after a moratorium of several years. *See Gregg v. Georgia*, 428 U.S. 153, 207 (1976) (opinion of Stewart, J.); *id.* at 207, 226 (White, J., concurring); *id.* at 227 (Blackmun, J., concurring).   In the post-*Furman* years, however, the Supreme Court revisited and reshaped the death penalty, approving and disapproving aspects of individual states' death penalty schemes.   In doing so, it attempted to establish meaningful safeguards to avoid states reverting to death penalty schemes that would be as arbitrary and random as those that the *Furman* Court found unconstitutional.[16] This reform also touched on the role of juries.   In the Court's view, procedural and substantive reforms would prevent the death penalty from being "wantonly and freakishly impose[d]."   Instead, a "jury's discretion [would be] channeled" and "circumscribed by the legislative guidelines."   *Id.* at 207.

———————————————

capricious death sentences.  To be sure, the opinions were splintered, but a majority of Justices shared that same basic sentiment." (footnote omitted)).

[16] *See Gregg*, 428 U.S. at 206 (opinion of Stewart, J.) ("The basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily.  Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant.  Left unguided, juries imposed the death sentence in a way that could only be called freakish.").

One aspect of this narrowing jurisprudence[17] tried "to ensure that only the most deserving of execution are put to death." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002).[18]  Only adult offenders

---

[17] Chelsea Creo Sharon, *The "Most Deserving" of Death: The Narrowing Requirement and the Proliferation of Aggravating Factors in Capital Sentencing Statutes*, 46 HARV. C.R-C.L. L. REV. 223, 225 (2011) ("The narrowing requirement demands that aggravating factors limit the death-eligible class to the most heinous offenders, whom jurors are likely to deem especially deserving of death sentences."); *see also Graham v. Florida*, 560 U.S. 48, 89 (2010) (Roberts, C.J., concurring) (describing "the unique context of the death penalty, a punishment that our Court has recognized must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution" (quotations omitted) (quoting *Roper v. Simmons*, 543 U.S. 551, 568 (2005)).

[18] The Supreme Court's narrowing jurisprudence is best contextualized, in part, as a response to the numerous distinguished members of that Court who argued, convincingly, that the death penalty is, in all circumstances, unconstitutional.  *See, e.g.*, *Gregg*, 428 U.S. at 227–31 (Brennan, J., dissenting) ("The fatal constitutional infirmity in the punishment of death is that it treats 'members of the human race as nonhumans, as objects to be toyed with and discarded. [It is] thus inconsistent with the fundamental premise of the [Eighth Amendment] that even the vilest criminal remains a human being possessed of common human dignity.'" (quoting *Furman*, 408 U.S. at 273 (Brennan, J., concurring))); *id.* at 231–41 (Marshall, J., dissenting) ("The death penalty, unnecessary to promote the goal of deterrence or to further any legitimate notion of retribution, is an excessive penalty forbidden by the Eighth and Fourteenth Amendments."); *Callins v. Collins*, 510 U.S. 1141, 1145 (1994) (Blackmun, J., dissenting) ("From this day forward, I no longer shall tinker with the machinery of death. . . . I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed.  It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies."); John Calvin Jeffries, JUSTICE LEWIS F. POWELL: A BIOGRAPHY 451–52 (1994) (explaining that, after his retirement, Justice Powell stated: "I have come to think that

who commit murder, and who are not insane or suffering from severe disabilities in areas of reasoning, judgment and control of their impulses, are eligible for the death penalty.[19]  Another aspect of this jurisprudence put procedures in place so that death penalty cases would be fair and, to a higher degree than other state criminal processes, uniform both in their substantive criminal phase and in their sentencing phase.[20]   The Supreme Court has reviewed death

_____

capital punishment should be abolished"); *Baze v. Rees*, 553 U.S. 35, 81 (2008) (Stevens, J., concurring) ("The time for a dispassionate, impartial comparison of the enormous costs that death penalty litigation imposes on society with the benefits that it produces has surely arrived."); *Glossip v. Gross*, 576 U.S. 863, 908–09 (2015) (Breyer, J., joined by Ginsburg, J., dissenting) (explaining that changes in society and recent scholarship, "taken together with . . . 20 years of experience on th[e Supreme] Court, . . . lead me to believe that the death penalty, in and of itself, now likely constitutes a legally prohibited 'cruel and unusual punishmen[t]'" (quoting U.S. Const. amend. VIII)).

[19] *See, e.g.*, *Thompson v. Oklahoma*, 487 U.S. 815, 838 (1988) (plurality opinion); *Roper*, 543 U.S. at 578; *Miller v. Alabama*, 567 U.S. 460, 465 (2012); *Coker v. Georgia*, 433 U.S. 584, 598 (1977) (plurality opinion); *Kennedy v. Louisiana*, 554 U.S. 407, 413 (2008); *Enmund v. Florida*, 458 U.S. 782, 801 (1982); *Ford v. Wainwright*, 477 U.S. 399, 410 (1986); *Atkins*, 536 U.S. at 306; *Hall v. Florida*, 572 U.S. 701, 704 (2014).

[20] The Supreme Court's cases addressing procedural safeguards in the death penalty context are legion.  *See, e.g.*, *Sumner*, 483 U.S. at 85; *Roberts v. Louisiana*, 428 U.S. 325, 336 (1976) (plurality opinion); *Woodson*, 428 U.S. at 301 (plurality opinion); *Beck v. Alabama*, 447 U.S. 625, 627 (1980); *Simmons v. South Carolina*, 512 U.S. 154, 161–62 (1994) (plurality opinion); *id.* at 178 (O'Connor, J., concurring in judgment); *Ring*, 536 U.S. at 588–89; *Hurst*, 577 U.S. at 94; *Lynch v. Arizona*, 578 U.S. 613 (2016); *Cruz v. Arizona*, 598 U.S. 17, 20 (2023).  The Court also has ensured that the actual process of executions themselves is constitutional and fair, *see, e.g.*, *Nelson v. Campbell*, 541 U.S. 637, 644–47 (2004); *Baze v. Rees*, 553 U.S. 35, 40 (2008) (plurality opinion); *Ramirez v. Collier*, 595 U.S. 411,

penalty schemes many times since 1972, creating a unique body of substantive and procedural law that has changed in the decades since Davis's trial.

The procedural rulings around the death penalty produced anomalies with respect to juries, however. For one thing, while juries must be unanimous to convict a defendant of a crime, *Ramos*, 590 U.S. at 93, around the time of Davis's trial, a splintered Supreme Court approved Alabama's death penalty scheme, which did not require jury unanimity for sentencing or vest sentencing authority in the hands of the jury, *see Harris v. Alabama*, 513 U.S. 504, 515 (1995). So, while a jury was required at sentencing, its role was minimized at this critical stage. In fact, a judge could override a jury's recommendation *not* to impose the death penalty. *See id.* at 515 (Stevens, J., dissenting) ("In Alabama, unlike any other State in the Union, the trial judge has unbridled discretion to sentence the defendant to death—even though a jury has determined that death is an inappropriate penalty, and even though no basis exists for believing that any other reasonable, properly instructed jury would impose a death sentence.").

In light of *Ramos*, it is apparent that this non-unanimous aspect of Alabama's death penalty sentencing scheme—which was in place at the time of Davis's trial—is irreconcilable with the Sixth Amendment's "vital" promise of jury unanimity. 590 U.S. at 90. The Supreme Court's more recent sentencing precedent—such as

---

416 (2022); *Nance v. Ward*, 597 U.S. 159, 162 (2022), to some extent, *see Boyd v. Hamm*, 146 S. Ct. 40, 40–44 (2025) (Sotomayor, J., dissenting).

*Hurst*, *Ring*, and *Apprendi*—further confirms Alabama's death penalty sentencing scheme flouted the Sixth Amendment multiple times over: a judge, not the jury, decided whether statutory aggravating circumstances existed, and the jury did not need to reach a unanimous conclusion in the punishment phase of the trial. Yet Alabama's scheme was also constitutionally unsupportable at the time. As Justice Marshall explained, "[i]t approaches the most literal sense of the word 'arbitrary' to put one to death in the face of a contrary jury determination where it is accepted that the jury had indeed responsibly carried out its task." *Jones v. Alabama*, 470 U.S. 1062, 1065 (1985) (Marshall, J., dissenting).[21]

---

[21] The Supreme Court approved similar schemes in other states as well. *See Spaziano v. Florida*, 468 U.S. 447 (1984), *overruled by Hurst*, 577 U.S. at 101; *Hildwin v. Florida*, 490 U.S. 638 (1989), *overruled by Hurst*, 577 U.S. at 101; *see also* Raoul G. Cantero, *Death is Different: The Need for Jury Unanimity in Death Penalty Cases*, 22 ST. THOMAS L. REV. 4, 33 (2009) ("Florida stands alone in allowing a simple majority of the jury both to recommend a sentence of death and to decide whether aggravating circumstances exist, and does not even require that majority to decide on the same aggravator."). After *Hurst* (and *Ramos*), the unconstitutionality of these schemes has been made clear, yet defendants like Davis have received little benefit from those rulings. For example, despite *Hurst*, Florida has re-enacted a new non-unanimous sentencing scheme, which suffers from the same problem as Alabama's scheme that was applied in Davis's case. *See Jackson v. State*, __ So.3d __, 2025 WL 3673716, at *21 (Fla. 2025) (Labarga, J., concurring in the judgment) (noting that Florida law began requiring unanimity after *Hurst* until a new statute was enacted to allow non-unanimity in 2023; *see also id.* at 22 ("[A] jury's unanimous recommendation of death provides a narrowing function that is wholly warranted in this state that, with 30 exonerations, still leads the nation in exonerations from death row.").

18-14671            ABUDU, J., Dissenting                29

For another thing, while jurors are supposed to be impartial and represent a fair cross-section of the community, States that pursue the death penalty have often sought and obtained the dismissal of jurors opposed to the death penalty.  *See* Stephen Gillers, *Deciding Who Dies*, 129 U. PA. L. REV. 1, 4–5 (1980).  Such a practice also is foreign to the historical scope of the jury trial right.  *Id.*  Taken together, these features of Alabama's scheme neutered the critical role of juries as impartial decisionmakers and checks on government overreach.  *See supra*, Section II.[22]  In states like Alabama, where judges are often elected, these schemes have been accused of incentivizing judges to impose the death penalty if they perceive that doing so will help their election chances, even if a jury did not so recommend.[23]    These features further minimized the

_____

[22] *See* G. Ben Cohen & Robert J. Smith, *The Death of Death Qualification*, 59 CASE W. RSRV. L. REV. 87, 89 (2008) ("Modern 'death-qualification jurisprudence frustrates the Framers' understanding as to the role of the criminal jury."); *see also* Joan L. Larsen, *Ancient Juries and Modern Judges: Originalism's Uneasy Relationship with the Jury*, 71 OHIO ST. L.J. 959, 965 (2010) ("Mutations in the original jury-and our understanding of its role-have left today's jury seeming, at best, like the original jury's distant cousin, and not at all like its twin."); Douglas Colby, *Death Qualification and the Right to Trial By Jury: An Originalist Assessment*, 43 HARV. J.L. & PUB. POL'Y 815, 841 (2020) ("Death qualification does not seem to have had a direct analogue at common law or early American practice.").

[23] *See* Richard R. W. Brooks & Steven Raphael, *Life Terms or Death Sentences: The Uneasy Relationship Between Judicial Elections and Capital Punishment*, 92 J. CRIM. L. & CRIMINOLOGY 609, 638–39 (2002); Paul Brace & Brent D. Boyea, *State Public Opinion, the Death Penalty, and the Practice of Electing Judges*, 52 AM. J. POL. SCI. 360, 370–71 (2008).

importance of the jury and produced unfairness, as evidenced by the fact that literature around the time suggested "that jurors were more 'life-prone' (more likely to sentence a defendant to life than death) than judges." Katheryn K. Russell, *The Constitutionality of Jury Override in Alabama Death Penalty Cases*, 46 ALA. L. REV. 5, 19 (1994).

In 2017, the Alabama legislature ended the past practice of judicial override of jury recommendations against the death penalty. *Alabama Abolishes Judge Override in Death Penalty Cases*, EQUAL JUST. INIT. (Jan. 29, 2026, at 02:32 PM), https://eji.org/news/alabama-legislature-passes-law-abolishing-judicial-override/ [https://perma.cc/6SN4-JZKJ]. All the same, relief has not been retroactive; many prisoners in Alabama await execution even though their jury did not unanimously recommend a death sentence. *See Alabama's Death Penalty*, EQUAL JUST. INIT. (Jan. 29, 2026, at 02:34 PM ET), https://eji.org/issues/alabama-death-penalty/ [https://perma.cc/7K2S-EEMG]. The number of affected defendants can be attributed, in part, to the fact that judges in Alabama imposed death sentences over a jury's recommendation of life much more frequently than they imposed life sentences over a death recommendation. *See Woodward v. Alabama*, 571 U.S. 1045, 1046 & n.1 (2013) (Sotomayor, J., dissenting).

While Alabama's scheme devalues juries, our *de novo* reading of *Strickland* and the Sixth Amendment should place juries in their rightful place as a protection against unfair and arbitrary punishment. *See Ramos*, 590 U.S. at 110 (rejecting a rule that would

"have us discard a Sixth Amendment right in perpetuity rather than ask two States to retry a slice of their prior criminal cases"); *Duncan*, 391 U.S. at 156. Otherwise, we simply are importing Alabama's unconstitutional scheme into our interpretation and application of *Strickland*.

★    ★    ★

Considering the whole body of Supreme Court precedent on the right to a jury under the Sixth Amendment, we should not promote non-unanimous death sentences and invasions on the right to a jury trial in death penalty cases.[24] *See Furman*, 408 U.S. at 371 (Marshall, J., concurring) ("This is a country . . . that clings to fundamental principles, cherishes its constitutional heritage, and rejects simple solutions that compromise the values that lie at the roots of our democratic system."). We also should give more deference, not less, to the jury's behavior when its hesitation suggests the defendant should not be subjected to the "ultimate sanction." *Id.* at 286 (Brennan, J., concurring). Davis was entitled to a trial by a jury of his peers, and he was entitled to have courts listen to and respect the voice of the jury. Alabama instead provided him a trial where the jury was deprived of highly relevant information, and courts ignored that the jury was still hesitant and non-unanimous, even without that information, to impose the death penalty.

---

[24] *See* Richa Bijlani, Note, *More Than Just a Factfinder: The Right to Unanimous Jury Sentencing in Capital Cases*, 12 U. MICH. L. REV. 1499, 1502 (2022) ("The uniqueness of death penalty sentencing requires that the Sixth Amendment confer more protection to defendants facing capital punishment, not less.").

For these reasons, the state court should have viewed the jury's hesitation to impose the death penalty here for what it was: a strong sign that Davis suffered prejudice and that the mitigation evidence his attorney failed to present would have changed the outcome. The state court's contrary ruling was unreasonable, and the panel majority's opinion resurrects unconstitutional aspects of Alabama's 1993 death penalty scheme, importing them into our Sixth Amendment precedent. We should have, instead, left ahistorical jury minimization in the past. *See Ramos*, 590 U.S. at 88, 93; *Roberts*, 428 U.S. at 336 ("The Eighth Amendment, which draws much of its meaning from 'the evolving standards of decency that mark the progress of a maturing society,' *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion), simply cannot tolerate the reintroduction of . . . practice[s] so thoroughly discredited.").

To Jimmy Davis, Jr., the question of whether a death penalty system might ever be fair and constitutionally applied is purely academic. He has experienced Alabama's death penalty system, and his trial was constitutionally unfair; his attorney's performance was woefully inadequate, and he was prejudiced by that performance. State courts failed to correct those constitutional errors, and federal courts have abdicated their responsibility to do so in their stead. While we, as a lower federal court, cannot fix all the problems with the death penalty, we should have fixed the errors in the case before us. I respectfully dissent.